# Kelly's Devisees *vs* Kelly.

APPEAL FROM THE WASHINGTON CIRCUIT.

*Wills.*

WILL CASE.

Case 86.

JUDGE MARSHALL delivered the opinion of the Court.

THE County Court of Marion having admitted to re-cord, a testamentary paper, purporting to be the last will and testament of Priscilla Kelly, a married woman, which had been offered for probate by the executor and devisees, and opposed by her husband, George P. Kelly, an appeal was taken by the husband, to the Circuit Court for Marion county, from which, by change of venue, the case was removed to the Washington Circuit Court. Upon a trial by witnesses in that Court, the Judge being of opinion that the paper offered was not the last will and testament of the said Priscilla Kelly, reversed the order of the Marion County Court, admitting it to probate, and in effect rejected the will. And the devisees have ap-pealed to this Court.

*April 30.*

The question sta-ted.

The case comes before this Court upon a record of the proceedings and evidence before the Circuit Court, and

this Court has, as in other cases, the power of affirming the judgment or sentence, or of reversing it and remanding the case, with directions either to retry it, if by any error the whole case was not sufficiently presented, or if the error be in the final decision, merely to render the judgment which this Court may deem appropriate.

The question of probate, as presented in this record, divides itself into two subordinate enquiries. 1st. Whether Priscilla Kelly had any power to make a will—and 2d. Conceding this, whether the proof is sufficient to establish the paper propounded as her will.

I. After what was said by this Court in the case of *Molly Yates' will*, (2 *Dana*, 215,) we deem it unnecessary to go into any discussion or statement of the general doctrines, relating either to the probate of wills of married women, or their right to make a will, or an appointment in the nature of a will, either as belonging to the right of disposing of their separate estate, or in pursuance of an anti-nuptial agreement, or in the exercise of a power of appointment, reserved by or conferred upon them. It is sufficient in this case, as it was deemed to be in that, to enquire whether Mrs. Kelly had *prima facie*, the power sufficient to authorize her to make a will, or an appointment in the nature of a will, disposing of any of the property mentioned in the paper in question. How far the power, if it exists, may have been pursued or exceeded, and how far the will may be available as a disposition of property under the power, are *ulterior* questions not necessarily, nor properly presented for decision in the Court of Probate. The case already referred to shows that the order admitting such a will to probate, should leave these questions open. And the case of *Johnson's trustees* vs *Yates' devisees*, (9 *Dana*, 491,) upon the same will, shows, that after it was admitted to probate, some of its devises were decided to be inoperative, because they exceeded her power.

The alledged will in this case, bears date on the 8th day of Dec. 1838. It recites that an agreement in writing had been executed before the marriage of the testatrix, by herself and G. P. Kelly, her intended husband and a trustee, but

A *feme covert* may under certain circumstances, have the power of disposing of property by a will, or a power of appointment in the nature of a will, if *prima facie* she is shewn to have such power, the Court of probate cannot inquire whether it has been properly exercised, on the will being offered for probate.

which had been destroyed by her husband after marriage, without her consent, whereby she was authorized to devise and dispose of all the estate she then had, as if she were a *feme sole*, &c. and under that authority, "and also by legal authority vested in her," the testatrix professes to make the will.

Before the date of the will, George P. Kelly had, during the coverture, executed a deed to Jeroboam Beauchamp, as the friend and trustee of his wife, whereby for the recited consideration of a promise or agreement, made to and with his wife before marriage, he covenants to assure to her or to such person as she may by will or deed appoint, all the slaves which she owned at her marriage, and he conveys said slaves to Beauchamp for the purpose of accomplishing the above object. And also covenants with him, that his wife shall have, and is hereby vested with full power and authority, so far as he can lawfully delegate it, to dispose of said slaves, and the increase, by will, deed or other lawful mode, to take effect after his death, &c. This instrument was executed also by the trustee and Mrs. Kelly.

A second instrument, under seal, was also executed by Kelly, before the date of the will, which recites "that there was a marriage article entered into between himself and his wife before marriage, which article he destroyed, which in substance was as followeth : Article of an agreement in three parts," &c. What follows purports to be the precise terms, and is proved to be substantially the terms of the ante-nuptial agreement, of which it is intended to be a renewal. And this agreement contains a power to the wife to devise the entire estate of land, slaves and personalty which she owned at her marriage, reserving or securing to Kelly a life estate in all.

It is contended, that the original instrument, of which this professes to be a copy or renewal, was not executed either by Mrs. Kelly, or by the trustee, and that as it contained mutual stipulations, it could not be binding on Kelly when is was not binding on the other party. But the only evidence of its non-execution, is the statement of a single witness, that both Mrs. Kelly and the trustee had told him they had not signed it. But

*An agreement by* *husband* *after* *marriage, entered into with a trustee, giving to the* wife *a power of disposing of property by will which she owned before the* coverture, *is* prima facie, *valid.*

on the other hand the recitals in both of the instruments executed by Kelly after the marriage, plainly imply, and against him, furnish strong, if not conclusive evidence, that there was a valid ante-nuptial agreement executed by his wife, as well as himself. The will is explicit on the subject, and moreover, the testatrix evidently attempts thereby to do substantially what, by the ante-nuptial agreement, as recited in the last instrument above mentioned, was to be done for the benefit of Kelly, by giving him a life estate in her land as well as in her slaves and personalty.

If, therefore, the existence of the power depended upon the question whether the anti-nuptial agreement had been executed by Mrs. Kelly, we should be of opinion that a *prima facie* case in favor of the power had been shown, and this is sufficient in the Court of probate. But whatever may be the fact with regard to the execution of the anti-nuptial agreement, or whatever might by its effect if not executed by Mrs. Kelly, or whatever may be the effect of the second instrument executed by Kelly after marriage, by which the anti-nuptial agreement which he had destroyed, was intended to be resuscitated, we are of opinion that the first post-nuptial deed made to Beauchamp, as trustee, contains a grant of power *prima facie,* valid and independent of the efficacy of the written marriage article, which authorized the testatrix to dispose of the slaves by will, and which therefore justified, and indeed required the admission of the *will to probate, upon* sufficient proof that it was the act of the testatrix, properly executed and attested as a will. If the testatrix was even mistaken in supposing the written anti-nuptial agreement was sufficient to sustain the power claimed, still if there is another valid grant of power, which is embraced in the general reference made in the will, the special reference to the anti-nuptial agreement can do no harm. Such special reference was unnecessary. By the deed now referred to, Kelly admits that he had promised, or agreed, before marriage, to assure to his intended wife, or to such person as she might by deed or will appoint, all the slaves, &c. As against him, this is certainly a sufficient consideration for making the promised assurance,

and granting the promised power, whether the promise was or was not made in such form as to be enforcible. And the deed must be deemed as between the parties, at least effectual to support the power which it professes to give. Whether it would be so, if there had been no ante-nuptial promise or agreement, we need not decide. There does not appear to have been any such in the case of Molly Yates' will. In this case, the necessary inference from all the testimony is, that before Kelly executed the marriage article, it had been understood and agreed between him and his intended wife, that such an article should be executed, or that in some mode, a power of disposing of the property which she then had, or of some portion of it, should be secured to her.

It is perhaps proper to add, that although it may be true, that the execution of the two post-nuptial deeds, on the part of Kelly, may have been induced by the discontent of his wife, and her refusal to live with him, first on discovering that he had destroyed the ante-nuptial agreement, and afterwards, on discovering that the first of these two deeds did not place her in the same condition with respect to her property that the agreement had promised, and although it be conceded that the immediate cause of his executing these instruments, was the desire of reconciling his wife, and bringing her back to his home, still it cannot be admitted that these considerations should have any tendency to invalidate the deeds; they are the solemn acts of Kelly himself. Their recitals and stipulations, and especially those of the first deed, were not even dictated by his wife, but were voluntarily adopted by him. And they establish facts which show that he was under the strongest obligations of justice and honor, to execute these, or other more effectual deeds, rendered necessary by his own improper act. And they show that he had intended and committed an injury to his wife, which, while it was calculated to produce dissatisfaction and desertion, justified her in demanding, and in coercing, by such reasonable means as were in her power, a just reparation. Whether in pursuing these means, she confined herself within the bounds of strict prudence and propriety, it is wholly unnecessary to enquire. She

obtained, at the utmost, nothing more than a just repara-
tion.  And the husband cannot now be permitted to re-
tract it by saying that what he ought to have done under
a sense of justice and of honor, he was induced to do
either from a fear of exposure, or from the apprehension
of losing the society of his wife.

II.  Assuming, then, that Mrs. Kelly was invested with
power to make a will, but without now determining the
extent of its operation, we come to the enquiry whether
the proof is sufficient to establish the paper in question
as her will.  Without recapitulating the evidence on
this subject, it is sufficient to say, that the formal exe-
cution and attestation of the will, are fully proved, and
are not contested.  But it is contended that the will was
procured by the undue influence of a favorite nephew of
the testatrix, who is the principal devisee ; that there is
no evidence that she knew what was in it when she exe-
cuted and acknowledged it, and that in fact, it should be
regarded as the will of the nephew, and not of the sup-
posed testatrix.  We do not however admit that these are
the proper conclusions from the evidence.  It is true,
that as Mrs. Kelly executed the will by affixing her mark
instead of signing her name, it may be presumed that
she could not read writing, and had not herself read the
will.  But it appears that she was a strong minded and
intelligent woman, deeply and actively solicitous, and
indeed jealous with regard to her own power of dispos-
ing of the estate which she had brought to her husband,
and determined not to be cheated out of it.  From these
facts, and the fact that she did actually execute and ac-
knowledge the will in the presence of intelligent and dis-
interested witnesses, and that it was deposited with a
friend whom she frequently visited afterwards, a presump-
tion arises so strong, as scarcely to be overcome by any
thing less than positive testimony to the contrary, that she
did know what was in the will before she executed it, and
that it accorded with her intention.  There is no proof
that the will was not in her possession before it was exe-
cuted, nor that it was not read over at the time.  Whether
it had or had not been in her possession for many hours,
during which it might have been read to her, and wheth-

The proof of the
will is satisfac-
tory.

er it was or not read to her at the time of its execution, are matters of mere inference, the witness who wrote and proved the will not being able to recollect as to either fact. We think the circumstances above referred to, es-tablish the inference, that in one of these modes she did know the contents of the will. And although the nephew referred to, who seems to have had peculiar claims upon her preference, did take an active part in procuring the will to be written, and furnished, in presence of his aunt, and with her presumed knowledge, written directions as to the disposition to be made of the property, it does not appear, and is not, we think, to be presumed, that he did any thing without her knowledge and direction; or that he exercised any control with regard to the distribution of the property, or that he had any individual concern in dic-tating the terms of the will, unless in regard to certain guards and restrictions upon the disposition of the prop-erty by Kelly during the continuance of his life estate, which might have been deemed necessary for the protec-tion of the interests in remainder. And which, wheth-er consistent with the power of Mrs. Kelly or not, must be presumed to have been approved of by her, and can no more vitiate the whole will, if supposed to have been made in the first instance under the direction of the neph-ew, than if made by the draftsman himself without dic-tation, under his implied authority and duty of inserting such provisions as would effectuate the intended disposi-tion of the property after the death of Kelly, who was to have it during his life.

It is to be observed too, with regard to the agency of the principal devisee, that the other devisees do not com-plain of any undue preference shown him in the will, or of any undue means used for obtaining it, or of his agency in any respect in procuring the execution of the will. They all unite with him in endeavoring to estab-lish it; and it is Kelly alone, who has no interest in the proportional distribution of the property among the devi-sees after his death, that objects on the ground of undue preference among them, induced by the undue influence of one of them. Certainly there is no ground for infer-ring that Mrs. Kelly, who was so extremely and actively

solicitous in asserting and establishing, against her hus-
band, her right to make a will, would not have made one
but for the undue influence and exertion of this nephew.

Upon the whole, we are of opinion that the will was
sufficiently proved, and therefore, that the Circuit Court
erred in rejecting it, and should have regarded it as a valid
disposition of so much of the property therein disposed
of as Mrs. Kelly had under the several instruments and
agreements above referred to, or otherwise power to dis-
pose of by will. And as the order of the County Court,
although it admitted the will to record without express res-
triction, ordered to record with it the two deeds above re-
ferred to, by which the power is proved, we do not deem
any further or express restriction necessary.

Wherefore, the judgment and sentence of the Circuit
Court rejecting said will and reversing said order, is re-
versed, and the cause is remanded with directions to af-
firm the said order, and to remand said will and the said
two deeds to the County Court of Marion, to be there
recorded, if not already done.

*Morehead & Reed and McHenry* for appellants; *Har-
din and Shuck* for appellee.

---

DEBT.

Case 87.

April 24.

The case stated.